**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

JAMES W.,[1]                                )
                                            )
    *Plaintiff*,                      )
                                            )
       v.                          )    Civil No. 3:24-cv-388-SLS
                                            )
FRANK BISIGNANO,[2]                          )
Commissioner of Social Security,            )
                                            )
    *Defendant*.                      )
                                            )

## MEMORANDUM OPINION

In this action, Plaintiff James W. seeks review of the Commissioner of the Social Security Administration's ("SSA") decision to deny his Title II application for disability insurance benefits and Title XVI application for Supplemental Security Income ("SSI"). This matter comes before the Court on cross-motions for summary judgment, which have been fully briefed, making this matter ripe for review. (ECF Nos. 13, 14, 15.) The Court exercises jurisdiction with the consent of the parties pursuant to 28 U.S.C. § 636(c)(1) (ECF Nos. 3, 16, 17) and pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

Plaintiff moves the Court to reverse the Commissioner's decision denying him social security benefits and either find him disabled or remand this matter for further administrative proceedings consistent with the Court's decision. (ECF No. 13, at 1; ECF No. 14, at 1, 13.) As

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that federal courts refer to claimants by their first names and last initials in social security cases.

[2] Frank Bisignano was sworn in as the Commissioner of Social Security on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, he has been substituted for the former Commissioner as Defendant in this action. 42 U.S.C. § 405(g). No further action need be taken. 42 U.S.C. § 405(g).

the basis for such relief, Plaintiff argues that the Administrative Law Judge's ("ALJ") residual functional capacity ("RFC") determination is not supported by substantial evidence because she erred in evaluating Plaintiff's subjective complaints[3] and failed to account for Plaintiff's mental limitations.  (ECF No. 14, at 8-12.)

In response, the Commissioner counters that "the ALJ reasonably discounted Plaintiff's subjective complaints and explained why his subjective complaints were not supported by the record."  (ECF No. 15, at 2.)  The Commissioner further asserts that substantial evidence supports the ALJ's finding that Plaintiff's non-severe mental impairments did not warrant specific limitations in the RFC assessment.  (ECF No. 15, at 25.)  The Commissioner asks that the Court affirm the ALJ's findings.  (ECF No. 15, at 29.)

For the reasons set forth below, the Court finds that the ALJ's consideration of Plaintiff's subjective complaints and mental impairments comports with applicable legal standards and that substantial evidence supports the ALJ's RFC determination.  Therefore, the Court will DENY Plaintiff's Motion for Summary Judgment (ECF No. 13), GRANT the Commissioner's Motion for Summary Judgment (ECF No. 15), and AFFIRM the final decision of the Commissioner.

## I.    PROCEDURAL HISTORY

Plaintiff filed applications for disability insurance benefits and SSI on June 30, 2020, alleging disability beginning on September 9, 2019.  (Administrative Record ("R.") at 121, 123, 125, 126.)[4]  In his applications, Plaintiff alleged that he suffered from blind or low vision, Post-

---

[3] Plaintiff's briefing separates out his challenges to the ALJ's consideration of his subjective complaints, with one relating to cervical pain and the other relating to heart symptoms.  (ECF No. 14, at 7.)  Because both challenge the ALJ's assessment of Plaintiff's subjective complaints, the Court addresses them together.

[4] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. Civ. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers from this

Traumatic Stress Disorder ("PTSD"), generalized anxiety disorder, panic disorder, agoraphobia, dissociative identity disorder, carpal tunnel syndrome in both wrists, coronary artery disease, chronic fatigue syndrome, and cervical nerve root disorder.  (R. at 78, 100.)  The SSA denied Plaintiff's claims initially and again upon reconsideration (R. at 151-52, 168-69, 171-72).  Plaintiff requested a hearing before an ALJ, and one was held on May 4, 2023.  (R. at 37-72, 175-76.)

On August 15, 2023, the ALJ issued a written decision, finding Plaintiff not disabled under the Social Security Act ("the Act").  (R. at 18-31.)  On April 4, 2024, the SSA Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-3.)  Plaintiff now seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II.     STANDARD OF REVIEW

The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual has a disability "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." *Id.* § 423(d)(2)(A).

SSA regulations set forth a five-step process to determine whether an individual is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio v. Colvin*, 780 F.3d 632, 634-35 (4th Cir.

---

Memorandum Opinion. The Court will further restrict its discussion of Plaintiff's medical information to the extent necessary to result in a proper analysis of the case.

2015) (describing the ALJ's five-step sequential evaluation).  At step one, the ALJ reviews the claimant's current work activity to determine if he or she has been participating in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  At step three, the ALJ determines whether the medical impairments meet or equal an impairment listed in the regulations.  *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  Between steps three and four, the ALJ determines the claimant's RFC, which accounts for the most that the claimant can do despite his or her impairments.  *Id.* §§ 404.1545(a), 416.925(a).

At step four, the ALJ assesses whether the claimant can perform his or her past employment given his or her RFC.  *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The burden of proof remains with the claimant through step four of the analysis, and the claimant must prove that his or her limitations preclude the claimant from performing his or her past relevant work.  *See Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012).  If such past work can be performed, then benefits will not be awarded, and the analysis ends.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).  However, if the claimant cannot perform his or her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant can perform other work that is available in the national economy.  *See id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The Commissioner usually offers this evidence through the testimony of a vocational expert.  *See Mascio*, 780 F.3d at 635.

In reviewing a decision to deny benefits, the Court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'"  *Id.* at 634 (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699

F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *See Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). The substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Dunn v. Colvin*, 607 F. App'x 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). Thus, a decision by the Commissioner is not subject to reversal merely because substantial evidence would have supported a different conclusion. *Id.*

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (second alteration in original)); *see Craig*, 76 F.3d at 589. The Court must consider the support for the Commissioner's decision and "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). If a fact is supported by substantial evidence, the Court must affirm, regardless of whether the Court agrees with such findings. *Hancock*, 667 F.3d at 476 (citing *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996)). If the Commissioner's findings are arbitrary or unjustified, then they are not supported by substantial evidence, and the Court must reverse the decision. *See Breeden*, 493 F.2d at 1007.

### III.    THE ALJ'S DECISION

The ALJ analyzed Plaintiff's disability claim under the five-step evaluation process. (R. at 18-31); *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Mascio*, 780 F.3d at 634. At step one,

the ALJ determined that Plaintiff had not engaged in substantial gainful activity since September 9, 2019 (the alleged onset date).  (R. at 20.)

At step two, the ALJ found that Plaintiff suffered from the severe impairments of cervical degenerative disc disease, coronary artery disease, carpal tunnel syndrome, obstructive sleep apnea, and obesity.[5]  (R. at 21.)  The ALJ found that Plaintiff did *not* suffer from any severe mental impairments.  (R. at 21-22.)  Specifically, the ALJ concluded that Plaintiff's "medically determinable mental impairments of depression and anxiety, considered singly and in combination, d[id] not cause more than minimal limitation in [his] ability to perform basic mental work activities and [were] therefore non[-]severe."  (R. at 21.)  In making that finding, the ALJ considered the four broad areas of mental functioning (commonly called "paragraph B" criteria) and concluded that Plaintiff's mental impairments caused no more than mild limitation in any of the functional areas.[6]  (R. at 21-22.)

In the first functional area of "understanding, remembering, or applying information," the ALJ found Plaintiff had no limitations.  (R. at 21.)  The ALJ acknowledged Plaintiff's allegations of headaches and "some questionable memory issues," but emphasized that Plaintiff could live alone with family nearby, follow medical advice, independently manage his medications, and drive.  (R. at 21.)  Under the second functional area, the ALJ found Plaintiff able to interact with

---

[5] Because Plaintiff's assignments of error challenge the ALJ's assessment of his cardiac problems, cervical issues, and mental impairments, as well as their resulting limitations, the Court similarly restricts its discussion of the ALJ's decision to those issues.

[6] The SSA evaluates the effects of a mental disorder on four areas of mental functioning based on a five-part rating scale.  20 C.F.R. Pt. 404, Subp. P, App. 1, § 12.00(F)(2).  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis in an area.  C.F.R. Pt. 404, Subp. P, App. 1, § 12.00(F)(2)(e).  A marked limitation exists when an impairment seriously limits the ability to do the same.  20 C.F.R. Pt. 404, Subp. P, App. 1, § 12.00(F)(2)(d).  Moderate indicates a fair limitation, mild includes a slight limitation, and "no" or "none" means the claimant can function in the area independently, appropriately, effectively, and on a sustained basis.  20 C.F.R. Pt. 404, Subp. P, App. 1, § 12.00(F)(2)(a)-(c).

medical professionals and family and thus without any limitations in "interacting with others." (R. at 21.) In the third functional area of "concentrating, persisting, or maintaining pace," the ALJ found Plaintiff mildly limited but explained that Plaintiff's descriptions of his limitations in performing tasks appears to stem from "physical rather than mental impairments." (R. at 21.) In the final functional area, the ALJ found Plaintiff mildly limited in "adapting [and] managing oneself." (R. at 22.) The ALJ noted that Plaintiff's physical impairments limited his ability to carry out household chores but he could otherwise "live[] alone in an RV on his son's property," cook limited meals, take care of his personal needs, drive, and independently manage his medication. (R. at 22.)

The ALJ concluded: "Because [Plaintiff's] medically determinable mental impairments cause[d] no more than 'mild' limitation in any of the functional areas *and* the evidence [did] not otherwise indicate that there [was] more than a minimal limitation in [Plaintiff's] ability to do basic work activities, they [were] nonsevere." (R. at 22 (emphasis in original) (citing 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1)).) Although Plaintiff's mental impairments were not severe, the ALJ further concluded that the RFC assessment also "reflect[ed] the degree of limitation . . . found in the 'paragraph B' mental function analysis." (R. at 22.)

At step three, the ALJ concluded that Plaintiff did not have an impairment, individually or in combination, which met or equaled a disability listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22-23.) In making this finding, the ALJ characterized the treatment for Plaintiff's cervical issues as conservative, including physical therapy and epidural steroid injections. (R. at 22.) Although surgery was proposed, Plaintiff rescheduled the surgery, cancelled the rescheduled appointment, and no longer received treatment for his cervical problems. (R. at 22.)

The ALJ found that Plaintiff's heart problems also did not satisfy any listing.  (R. at 22.)  Specifically, after bypass surgery and medication, follow-up testing (including EKGs and echocardiograms) was normal.  (R. at 22.)  In addition, Plaintiff "reported postoperatively that his chest pain and shortness of breath had resolved, though he recently reversed these assertions and informed his most recent cardiologist that the symptoms had persisted."  (R. at 22.)  Based on Plaintiff's "inconsistency regarding his reported symptoms and normal findings on testing," the ALJ found that Plaintiff's coronary artery disease did not satisfy any listing.  (R at 22.)

The ALJ then determined Plaintiff's RFC.  (R. at 23-30.)  Based on the record, the ALJ found that Plaintiff retained the ability to perform light work as defined by 20 C.F.R. §§ 404.1567(b) and 416.967(b) with the following limitations:

> [Plaintiff] can lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk for six hours and sit for six hours in a workday with normal breaks.  [Plaintiff] can frequently climb ramps and stairs, balance on uneven terrain, stoop and kneel and occasionally crawl.  He needs to avoid extreme cold, heat, humidity, fumes, odors, gases and poor ventilation.  [Plaintiff] can frequently handle, finger and feel and he can frequently perform overhead reaching.

(R. at 23.)

In arriving at the RFC, the ALJ first summarized Plaintiff's subjective complaints.  (R. at 23.)  At the hearing, Plaintiff testified that he could not work due to injuries sustained in a work-related accident.  (R. at 23-24.)  Plaintiff stated that the workers' compensation doctor had not released him to work following the accident.  (R. at 24.)  Plaintiff reported experiencing severe neck, wrist, and arm pain, as well as PTSD with associated anxiety and panic attacks.  (R. at 24.)  Plaintiff testified that his panic attacks began in 2009 and were triggered by crowds, disruptions in routine, and watching "something bad" on television.  (R. at 24.)  In addition, Plaintiff stated that he had chest pains, felt weak and out of breath, and passed out when overheated.  (R. at 24.)

On good days, Plaintiff reported being able to stand for less than 15 minutes and lift 15 pounds. (R. at 24.)  On bad days, Plaintiff stated he was limited to lifting less than 10 pounds.  (R. at 24.)

Regarding his reported activities, Plaintiff lived independently in an RV located on his son's property.  (R. at 24.)  He moved there in 2021 to have help nearby, and Plaintiff testified that he babysat his six- and twelve-year-old grandchildren every few weeks.  (R. at 24.)  In addition, Plaintiff could "drive at times" but noted that his mother drove him to medical appointments.  (R. at 24.)

The ALJ then detailed Plaintiff's medical records pertaining to his impairments.  (R. at 25-29.)  The ALJ first considered medical evidence relating to Plaintiff's cervical pain, which began in July 2019 after a work-related accident.  (R. at 25.)  Records after the accident showed that Plaintiff had tenderness to palpation in the cervical spine with reduced range of motion that improved with physical therapy and home exercises.  (R. at 25.)  While Plaintiff continued to report neck pain with lifting and rotating his head, he had full strength in all extremities and no limitation in range of motion.  (R. at 25.)

In November 2019, Plaintiff presented to OrthoVirginia, complaining of neck pain radiating to the shoulders, upper back, and head.  (R. at 27.)  He further reported that he took muscle relaxers and pain medication as well as attended some physical therapy to manage the pain. (R. at 27.)  On exam, Plaintiff had no instability of the neck, acceptable range of motion in the cervical spine, full range of motion in both upper extremities, and intact sensation from C5 through T1.  (R. at 27.)  Imaging showed loss of disc height without fracture or instability and foraminal stenosis.  (R. at 27.)  Based on the imaging evidence, Plaintiff was referred for epidural steroid injections.  (R. at 27.)

In January 2020, Plaintiff received epidural steroid injections and noted "only brief relief from his neck pain." (R. at 27.) A pain management provider limited Plaintiff to light work but found that the imaging evidence "did not show a basis for [Plaintiff]'s subjective complaints and the reported weakness." (R. at 27.) In February 2020, Plaintiff reported difficulty turning his head after a motor vehicle accident and was advised to continue his pain management provider's restrictions. (R. at 25.) However, Plaintiff's pain management provider "refused to further treat [him] unless he underwent treatment for his alcohol abuse." (R. at 25.) Plaintiff declined alcohol abuse treatment and was advised that "he would not find another pain management provider to treat him" given his substance abuse. (R. at 25.)[7] In September 2020, an orthopedist recommended spinal surgery, and Plaintiff initially scheduled the surgery for November 2020. (R. at 27-28.) Plaintiff, however, subsequently rescheduled the surgery for December 2020 and ultimately did not get the surgery. (R. at 27-28.)

In March 2022, Plaintiff had full strength and range of motion in all extremities, no evidence of focal tenderness to palpation of the spine, and normal gait. (R. at 28.) In February 2023, Plaintiff complained of "slowly improving" neck pain from a recent motor vehicle accident. (R. at 28.) On exam, Plaintiff displayed normal strength and a normal range of motion in the left shoulder and cervical spine (with limited extension and lateral rotation). (R. at 28-29.) He was instructed to take medication, use ice and heat, and perform range of motion exercises, and advised that he could try injections and physical therapy if his symptoms did not improve. (R. at 29.)

Regarding Plaintiff's cardiac impairments, medical records showed that Plaintiff began complaining of chest pain and shortness of breath in November 2018. (R. at 25.) While Plaintiff had normal physical and mental findings on exam, cardiovascular stress testing revealed mid

---

[7] At the hearing, Plaintiff testified that he stopped drinking alcohol in April 2021. (R. at 24.)

anterior ischemia, and he was prescribed several medications and scheduled for cardiac catheterization. (R. at 25.) In December 2018, Plaintiff underwent a triple bypass surgery. (R. at 25.) In January 2019, at a postoperative examination, Plaintiff reported some residual clavicular soreness but that his chest pain had otherwise resolved. (R. at 26.) His cardiac examination was "essentially normal" and he was instructed to attend cardiac rehab. (R. at 26.) At a second postoperative examination, Plaintiff was not cleared to return to work because "his employer would not let him return until he could lift up to [150] pounds and wear a [40] pound hazmat pack," which "exceeded [the] tolerance on [Plaintiff's] incision at that time." (R. at 26.) Plaintiff attended two cardiac rehab sessions but noted that his insurance would not cover further sessions. (R. at 26.)

In March 2019, Plaintiff reported dizziness, fainting, and high blood pressure, but examination findings were "essentially benign." (R. at 26.) In December 2019, Plaintiff had a "somewhat elevated blood pressure" but an echocardiogram showed no valvular disease. (R. at 26.) In August 2020, Plaintiff reported back pain, but no further chest pain. (R. at 26.)

In May 2021, Plaintiff noted that he "felt fine" despite running out of his cardiac medications. (R. at 26.) On exam, Plaintiff had "excellent" blood pressure and "essentially normal" physical and mental findings but was advised not to run out of his cardiac medications due to concerns that his bypasses could develop new blockages. (R. at 26.)

In November 2021, Plaintiff reported severe shortness of breath and chest pain to a new cardiologist, who "found it concerning that [Plaintiff] would have rather dramatic symptoms in the presence of normal EKG, normal echocardiogram and good blood pressure and heart rate." (R. at 26.) While his cardiologist ordered another stress test, he noted that Plaintiff had not made such complaints in the past and "none of the prior cardiologists had done aggressive workup." (R. at

26.)  In December 2021, a stress test was normal with an ejection fraction of 61 percent and no ischemic changes.  (R. at 26.)  Notably, Plaintiff denied having chest pain during the test.  (R. at 26.)  Based on the test results, his cardiologist found the chest pain unrelated to coronary artery disease and the shortness of breath likely related to deconditioning.  (R. at 26.)

In October 2022, Plaintiff presented for a routine appointment, complaining of worsening shortness of breath and chest pain.  (R. at 26.)  He refused additional medication to manage his symptoms and instead underwent another cardiac catheterization on October 17, 2022.  (R. at 26.)  The procedure showed "90% blockage of the left anterior descending coronary artery, despite a patent bypass to the diagonal branch."  (R. at 26-27.)

Regarding Plaintiff's mental impairments, treatment providers acknowledged Plaintiff's history of anxiety but found he had normal mental status findings on examination.  (R. at 25-28.)  Plaintiff saw a therapist for three months in 2019 but did not continue therapy.  (R. at 29.)  In October 2020, Plaintiff presented to Roanoke Valley Psychiatric Associates, reporting that he occasionally heard voices and had one panic attack in recent months.  (R. at 28.)  However, examination notes showed normal mental status, listed minimal psychotic symptoms, and described Plaintiff's condition as stable on medication.  (R at 28.)  At a subsequent appointment, Plaintiff reported one panic attack since his last visit, which he managed with medication, and stated that "for the first time in his life he felt normal."  (R. at 28.)  A mental status examination in March 2021 was unchanged.  (R. at 28.)  Moreover, in March 2022, Plaintiff denied any mental or psychiatric impairments at a primary care appointment.  (R. at 28.)

The ALJ concluded that Plaintiff's "statements about the intensity, persistence, and limiting effects of his symptoms [were] inconsistent" with the record evidence.  (R. at 25.)  In supporting that conclusion, the ALJ first noted that after Plaintiff's heart surgery in December

2018, his chest pain improved, he had a normal heart rate, and any remaining pain was attributed to his incision.  (R. at 29.)  Subsequent treatment records showed Plaintiff denied shortness of breath and chest pain until November 2021, and even then, his cardiologist was skeptical of those complaints because his colleagues would have "diligently continue[d] workup if [Plaintiff had been] reporting ongoing symptoms," and Plaintiff's cardiac functioning was normal on examination.  (R. at 26, 29.)  Second, Plaintiff repeatedly denied anxiety and depression, saw a therapist for only three months in 2019, and had not received any psychiatric treatment since March 2021.  (R. at 28, 29.)  Third, treatment records for Plaintiff's cervical issues showed "no operative notes, no postoperative follow up or indeed any orthopedic or neurosurgical treatment since" Plaintiff's scheduled cervical fusion.  (R. at 29.)  Moreover, there were no complaints of back pain between December 2020 and February 2023, and any treatment was "extremely conservative." (R. at 27, 28, 29.)  The ALJ stated that her decision did "not [contain] a complete list of the inconsistencies in the record but [those identified were] representative of the record as a whole." (R. at 29.)

The ALJ also considered the medical opinions and prior administrative medical findings. (R. at 29-30.)  The state agency medical consultants opined that Plaintiff could perform light exertional work with some postural and environmental limitations.  (R. at 29.)  The ALJ found these opinions persuasive, explaining that they were consistent with the orthopedic and cardiologist records.  (R. at 29.)  The state agency psychological consultants found the alleged mental impairments non-severe.  (R. at 30.)  The ALJ noted that those opinions were consistent with the "very limited mental health treatment" and "normal mental status assessments" in the record and were thus persuasive.  (R. at 30.)

After completing the RFC assessment, the ALJ found at step four that Plaintiff could not perform his past relevant work.  (R. at 30.)  The ALJ then determined Plaintiff's vocational factors, including that he had at least a high school education and met the definition of a younger individual at the alleged onset date and subsequently changed age category to closely approaching advanced age.  (R. at 30.)  At step five, the ALJ found Plaintiff able to perform jobs existing in significant numbers in the national economy considering his vocational factors and RFC.  (R. at 30.)  The ALJ adopted the vocational expert's testimony that Plaintiff could perform the light, unskilled jobs of router, non-postal mail clerk, and finish inspector.  (R. at 30-31.)  Therefore, the ALJ found Plaintiff not disabled from September 9, 2019 (the alleged onset date) through August 15, 2023 (the date of the decision).  (R. at 31.)

## IV.    ANALYSIS

Plaintiff raises two challenges to the ALJ's decision.  First, Plaintiff argues that the ALJ erred in discounting Plaintiff's subjective symptoms stemming from his cervical and heart impairments.  (ECF No. 14, at 8-12.)  Second, Plaintiff asserts that the ALJ's RFC finding failed to account for his mental limitations.  (ECF No. 14, at 12.)  The Court addresses each argument below and finds no reversible error.

### A.  The ALJ Applied Correct Legal Standards in Evaluating Plaintiff's Subjective Complaints, and Substantial Evidence Supports the ALJ's RFC Determination

Plaintiff argues that the ALJ erred in evaluating his subjective complaints.  (ECF No. 14, at 8-12.)  Specifically, Plaintiff argues that the ALJ applied an incorrect legal standard when she discounted his subjective complaints of cardiac issues and cervical pain as inconsistent with the record evidence.  (ECF No. 14, at 8-12.)  Contrary to Plaintiff's argument, the ALJ evaluated Plaintiff's subjective complaints as required by applicable legal standards and did not selectively consider the record evidence.  Substantial evidence supports the ALJ's RFC determination.

14

### 1. Standard for Evaluating Subjective Complaints

The regulations provide a two-step process for evaluating Plaintiff's subjective complaints. 20 C.F.R. §§ 404.1529, 416.929; *see also* SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, "the ALJ must determine whether objective medical evidence presents a 'medically determinable impairment' that could reasonably be expected to produce the claimant's alleged symptoms." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020) (citing 20 C.F.R. § 404.1529(b); SSR 16-3p). Second, "after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled." *Id.* The ALJ must consider all available evidence in this determination, including objective medical evidence, an individual's statements about the intensity, persistence, and limiting effects of the symptoms, and medical opinions and statements from others. *Id.* The claimant does not need to produce objective evidence to satisfy this second prong. *Id.*

### 2. The ALJ Properly Evaluated Plaintiff's Subjective Complaints

Here, the ALJ followed the two-step process in considering Plaintiff's subjective complaints. At the first step, the ALJ found that Plaintiff's medically determinable impairments could lead to the alleged symptoms. (R. at 24.) At the second step, and "[a]fter careful consideration of the evidence," the ALJ determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the ALJ's] decision." (R. at 24-25.) While Plaintiff contends that the ALJ failed to comply with her obligations under the second step by "simply cherrypick[ing] facts" from the record (ECF No. 14, at 9 (internal quotation marks omitted)), the ALJ's decision shows otherwise.

The ALJ acknowledged Plaintiff's impairments and provided a summary of the medical record and treatment plan.  (R. at 23-30.)  Following the ALJ's evaluation of Plaintiff's subjective complaints, the ALJ determined that Plaintiff's "statements about the intensity, persistence, and limiting effects of his symptoms" were inconsistent with the record evidence.  (R. at 25.)  The ALJ supported that conclusion by identifying inconsistencies between Plaintiff's subjective complaints and his medical record, treatment plan, and statements to providers.  (R. at 23-30.)  The ALJ added that her decision "[did] not [include] a complete list of the inconsistencies in the record but [those identified were] representative of the record as a whole."  (R. at 29.)  This constitutes substantial evidence supporting the ALJ's RFC assessment.

First, the ALJ considered inconsistencies between Plaintiff's subjective complaints of chest pain and the record evidence.  (R. at 29.)  The ALJ acknowledged Plaintiff's history of cardiac issues, including a triple bypass surgery in December 2018.  (R. at 29.)  However, the ALJ found that Plaintiff's chest pain improved, and he did not report shortness of breath or chest pain for nearly three years following his surgery.  (R. at 29.)  When Plaintiff began reporting cardiac symptoms again in November 2021, his cardiologist noted that "[h]is description of symptoms [was] very dramatic" and "[i]t [was] difficult to believe that [his previous providers] did not address these symptoms more aggressively."  (R. at 808.)

Despite finding Plaintiff's symptoms "out of proportion to a patient with normal EKG[,] normal physical exam[,] and the latest echocardiogram showing normal left ventricular function" (R. at 808), his cardiologist ordered additional testing, which was "completely normal" (R. at 798). His cardiologist also concluded that "[n]o further [cardiac] evaluation [was] required" and Plaintiff's problem was non-cardiac and "[p]robably [related to] deconditioning."  (R. at 800.)  The record also showed that "regular monitoring of [Plaintiff]'s cardiac functioning was normal."  (R.

at 29; *see also* R. at 26-27 (citing Exhibit 9F [R. at 775], Exhibit 13F [R. at 799-800, 807], Exhibit 15F [R. at 861, 865-66]).)  Contrary to Plaintiff's argument (*see* ECF No. 14, at 10), the ALJ did not err in finding this lengthy gap in reported symptoms, in combination with other portions of the record, inconsistent with Plaintiff's reports of debilitating cardiac symptoms during the relevant period.

Second, the ALJ acknowledged Plaintiff's statements about his work-related cervical spine injury and related back and neck pain.  (R. at 25-29.)  At the same time, the ALJ noted that examination findings showed acceptable range of motion in the cervical spine, full strength and range of motion in both upper extremities, and no instability of the neck.  (R. at 27-28 (citing Exhibit 4F [R. at 625, 633]).)  The ALJ also considered a pain management provider's statement that the "MRI finding[s] for [Plaintiff's] neck were not so significant to support the diffuse weakness he demonstrated on the exam as well as the severe limitations in cervical mobility."  (R. at 651; R. at 27-28 (citing Exhibit 4F).)  In any event, Plaintiff was scheduled for a cervical fusion surgery in December 2020 but ultimately did not have the recommended procedure.  (R. at 29, 62.)  The ALJ noted that the record did not show "any orthopedic or neurosurgical treatment since the day [Plaintiff] originally agreed to undergo the surgery" in late 2020.  (R. at 29.)  In addition, the ALJ pointed out that the record did not contain further reports of cervical pain until February 2023, following a motor vehicle accident.  (R. at 28-29 (citing Exhibit 16F [R. at 872-74]).)  Plaintiff received conservative treatment at that time, including prescription and over-the-counter medication, instructions on using ice and heat, and performing daily stretching exercises.  (R. at 29.)

Plaintiff argues that the ALJ failed to acknowledge possible reasons for the surgery cancellation.  (ECF No. 14, at 10.)  Specifically, Plaintiff testified that he did not undergo the

surgery because he received a second opinion that the surgery could result in lost mobility and offered "a very low chance . . . that the surgery would actually lessen the pain in [his] neck." (R. at 62.) The ALJ, however, considered the cancelled surgery in combination with other factors that discounted Plaintiff's alleged symptom severity, including the gap in both treatment and reported pain following the cancellation of the surgery. His primary care provider recommended further conservative treatment, including injections and physical therapy, if Plaintiff's symptoms did not improve, but the record does not show Plaintiff seeking further treatment. (R. at 29 (citing Exhibit 16F [R. at 874]).) Thus, the ALJ reasonably concluded that the record did not support Plaintiff's subjective complaints of debilitating back and neck pain.[8]

The ALJ applied the correct legal standards and reasonably concluded, based on the evidence, that Plaintiff's statements about the intensity and persistence of his symptoms were not entirely consistent with the other evidence in the record. In addition, substantial evidence supports the ALJ's decision. To the extent Plaintiff takes a different view of the evidence, the Court cannot

---

[8] In one sentence, Plaintiff argues that "the ALJ fail[ed] to explain why she discounted [his] testimony about fatigue and headaches." (ECF No. 14, at 11.) Plaintiff's "'conclusory remark' is insufficient to allege with requisite specificity why this was legal error, and he 'fails to develop this argument to any extent in [his] brief.'" *Demaris L.B. v. Kijakazi*, No. 3:21-cv-106, 2022 WL 2761411, at *5 (E.D. Va. June 9, 2022) (alteration in original) (citing *Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 152 n.4 (4th Cir. 2012)), *report and recommendation adopted*, 2022 WL 2761130 (E.D. Va. July 14, 2022). The Court finds review of this issue precluded by Plaintiff's failure to develop this argument in his brief. *See Parms v. Colvin*, No. 1:13-cv-1002, 2015 WL 1143209, at *8 n.10 (M.D.N.C. Mar. 13, 2015) ("The Court need not address such perfunctory arguments by counsel."); *Crystal C. v. O'Malley*, No. 6:23-cv-3821, 2024 WL 4486799, at *9 (D.S.C. June 5, 2024) ("[T]he court is not required to rummage through the administrative record to construct and present a well-supported position for the plaintiff."), *report and recommendation adopted*, 2024 WL 4343710 (D.S.C. Sept. 30, 2024).

In any event, the ALJ considered the limited treatment Plaintiff received for headaches and sleep apnea, as well as Plaintiff's failure to follow through with recommended treatment, in weighing Plaintiff's subjective complaints. (R. at 23, 27.) The Court finds no reversible error.

reweigh conflicting evidence or substitute its judgment for that of the ALJ.  *See Hancock*, 667 F.3d at 472; *Dunn*, 607 F. App'x at 274.

## B.  The ALJ Properly Considered Plaintiff's Mental Limitations in Determining the RFC

Plaintiff argues that the ALJ failed to include adequate limitations in the RFC to address Plaintiff's mental impairments.  (ECF No. 14, at 1.)  Specifically, he contends that the ALJ failed to explain why the RFC contained no limitations relating to his mental impairments even though his "testimony and the medical records support that his mental health symptoms would limit him to unskilled work."[9]  (ECF No. 14, at 12.)  In response, the Commissioner contends that ALJs need not explain why mental impairments with mild limitations or de minimis effects do not translate into functional limitations in the RFC, and any error in failing to include mental limitations would be harmless as the three jobs identified by the vocational expert and adopted by the ALJ were all unskilled positions.  (ECF No. 15, at 25-28.)

As an initial matter, Plaintiff's argument that the ALJ erred by not limiting him to unskilled work due to his mental impairments fails because the three jobs identified by the ALJ at step five are all unskilled work within the RFC determination.  (R. at 31 (identifying "router, DOT 222.587-038, light exertion, unskilled work, SVP 2, with 50,000 jobs in the national economy," "non-postal mail clerk, DOT 209.687-026, light, unskilled work, SVP 2, with 40,000 jobs in the national economy," and "finish inspector, DOT 741.687-010, light, unskilled work, SVP 2, with 50,000 jobs in the national economy").)  Regardless, the Court also finds that the ALJ reasonably

---

[9] While Plaintiff's "Questions Presented" section appears to assign error to the ALJ's failure "to include off-task limitations" in the RFC determination (ECF No. 14, at 7), his argument section challenges only the ALJ's failure to limit him to unskilled work (*id.* at 12).  As previously stated, the Court "need not address . . . perfunctory arguments by counsel." *Parms*, 2015 WL 1143209, at *8 n.10.  Therefore, the Court does not address the "off-task" issue raised only in a question presented.

accounted for Plaintiff's mental limitations in the RFC and sufficiently explained how she made those determinations.

The ALJ considered Plaintiff's mental limitations at step two. She found that Plaintiff's "medically determinable mental impairments cause[d] no more than 'mild' limitation in any of the functional areas" and were thus "non[-]severe." (R. at 22.) In so finding, the ALJ determined that Plaintiff had *no* limitations in understanding, remembering, or applying information and interacting with others and only a *mild* limitation in concentrating, persisting, or maintaining pace and adapting or managing oneself. (R. at 21-22.) In other words, the ALJ found no more than slight limitations in Plaintiff's ability to function "independently, appropriately, effectively, and on a sustained basis" in all four areas used to evaluate mental impairments. 20 C.F.R. Pt. 404, Subp. P, App. 1, § 12.00(F)(2)(a)-(c).

The ALJ further explained her reasoning for concluding that Plaintiff had no more than a mild limitation in any of the areas of mental functioning. Although Plaintiff reported headaches and "some questionable memory issues," he could follow medical advice, interact appropriately with medical professionals and family, and independently manage his medications. (R. at 21.) The ALJ further emphasized Plaintiff's function reports and testimony, which supported his ability to live alone in an RV on his son's property, drive, perform limited household chores, prepare limited meals, and care for his personal needs. (R. at 21-22.)[10] The ALJ acknowledged Plaintiff's

---

[10] Plaintiff argues that the ALJ erred by failing to discuss the extent to which he could perform his activities of daily living. (ECF No. 14, at 8-11.) Indeed, in assessing a claimant's daily activities, the ALJ must consider both the types of activities that a claimant can perform and the extent to which a claimant can perform them. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). The ALJ complied with this requirement. (R. at 21-22.) For example, the ALJ acknowledged that Plaintiff could "live alone, *though close to family*," complete "*limited* household chores," and prepare "*limited* meals." (R. at 21-22 (emphases added).) The ALJ did not simply consider the types of activities that Plaintiff could perform, but also the extent to which he could perform them.

limited ability to perform certain tasks, but found those limitations were based on his physical, not mental, impairments.  (R. at 21-22.)  These findings support the ALJ's conclusion that Plaintiff's mental impairments had no more than a "minimal limitation in [Plaintiff]'s ability to perform basic mental work activities" and the absence of mental limitations in Plaintiff's RFC, which as the ALJ noted, "reflects the degree of limitation . . . found in the 'paragraph B' mental function analysis." (R. at 21-22.)

While Plaintiff challenges the ALJ's failure to explain the omission of any limitations relating to his mild mental impairments in the RFC assessment (ECF No. 14, at 12), "ALJs are not required to explain or incorporate functional limitations with de minimis effect in RFCs." *Kimberly G. v. Comm'r of Soc. Sec.*, No. 2:21-cv-45, 2021 WL 8086729, at *10 (E.D. Va. Dec. 7, 2021), *report and recommendation adopted*, 2022 WL 882165 (E.D. Va. Mar. 24, 2022); *see also Lori A. J. v. Kijakazi*, No. 2:22-cv-131, 2023 WL 3069394, at *6 (E.D. Va. Apr. 5, 2023) ("[A]n ALJ is not required to discuss non-severe impairments in the RFC analysis so long as the ALJ considered them in the decision."), *report and recommendation adopted*, 2023 WL 3060789 (E.D. Va. Apr. 24, 2023); *Victoria B. v. Kijakazi*, No. 3:22-cv-157, 2023 WL 2579461, at *8 (E.D. Va.

---

(R. at 22-24); *see Dangelette D. v. Saul*, No. 3:19-cv-358, 2020 WL 5046293, at *4 (E.D. Va. Aug. 26, 2020).

Plaintiff further claims that the ALJ erred in "extrapolating from daily and life activities that [Plaintiff] ha[d] [an] increased [RFC]."  (ECF No. 14, at 11-12 (internal quotations and citations omitted).)  This argument too is without merit.  The ALJ properly considered Plaintiff's daily activities to evaluate whether his subjective complaints were fully consistent with the record and "not as examples of the functions [Plaintiff] could perform for an entire day."  *Ladda v. Berryhill*, 749 F. App'x 166, 173 n.4 (4th Cir. 2018).

For these reasons, the Court finds no error in the ALJ's consideration of Plaintiff's daily activities.  *See Footman v. Kijakazi*, No. 21-1116, 2023 WL 1794156, at *2 (4th Cir. Feb. 7, 2023) (concluding that "the ALJ adequately considered the extent to which [Plaintiff] was limited in performing her daily activities"); *Delesline-Meggett v. Comm'r of Soc. Sec.*, No. 21-1859, 2023 WL 8230802, at *2 (4th Cir. Nov. 28, 2023) (rejecting argument that ALJ "cherrypicked facts" where "[t]he ALJ accurately represented the record as a whole and did not mischaracterize or ignore material facts").

Mar. 20, 2023) (concluding "that the ALJ was not required to incorporate Plaintiff's mild limitations in the [RFC]"); *Younger v. Berryhill*, No. 2:18-cv-182, 2019 WL 3432771, at *5 (E.D. Va. June 21, 2019) (finding remand was not required "when the ALJ failed to give an explanation in the presence of mild limitations only"), *report and recommendation adopted*, 2019 WL 3451305 (E.D. Va. July 29, 2019). In finding Plaintiff's mental impairments non-severe, his "limitations by their nature have 'no more than a minimal effect' on [his] working ability." *Kimberly G.*, 2021 WL 8086729, at *10 (quoting SSR 85-28, 1985 WL 56856 (Jan. 1, 1985)); *see also Presnell v. Colvin*, No. 1:12-cv-299, 2013 WL 4079214, at *4 (W.D.N.C. Aug. 13, 2013) ("The ALJ determined . . . that Plaintiff's mental impairments were non-severe, and as a result, concluded that they caused little or no functional limitation which would impact . . . Plaintiff's RFC.").

Regardless, the ALJ did consider and address Plaintiff's mental impairments in determining his RFC. Treatment records showed normal mental status findings (R. at 25-26 (citing Exhibit 2F [R. at 579]); R. at 26 (citing Exhibit 9F [R. at 775]); R. at 27 (citing Exhibit 3F [R. at 615]); R. at 28 (citing Exhibit 6F [R. at 741], Exhibit 8F [R. at 756, 763])), and that Plaintiff's mental impairments were stable on medication with "minimal psychotic symptoms." (R. at 28 (citing Exhibit 6F [R. at 741], Exhibit 8F [R. at 756, 764]).) Plaintiff reported attending therapy for three months in 2019, and the record contained no records of psychiatric care after March 2021. (R. at 28, 29.) Indeed, Plaintiff denied anxiety and depression during subsequent visits to his primary care provider. (R. at 29, 776, 862.) The ALJ also considered the medical opinions of state agency psychological consultants, who opined that Plaintiff's mental impairments were non-severe. (R. at 30 (citing Exhibit 7A [R. at 131-32], Exhibit 8A [R. at 141-42]).) The ALJ found, within the RFC assessment, that these medical opinions were persuasive and consistent with the

very limited mental health treatment and normal mental status findings in the record evidence.  (R. at 30.)

Substantial evidence supports the ALJ's findings that Plaintiff's non-severe mental impairments did not justify mental RFC limitations.  Therefore, the Court finds no error.

## V.    CONCLUSION

For the reasons set forth above, the Court will DENY Plaintiff's Motion for Summary Judgment (ECF No. 13), GRANT the Commissioner's Motion for Summary Judgment (ECF No. 15), and AFFIRM the final decision of the Commissioner.  An appropriate Order will accompany this Memorandum Opinion.

_____ /s/

Summer L. Speight
United States Magistrate Judge

Richmond, Virginia
Date: September 29, 2025